

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00215-CV

_____

IN THE INTEREST OF T.D., A CHILD

On Appeal from the 231st District Court
Tarrant County, Texas
Trial Court No. 231-691096-20

Before Sudderth, C.J.; Kerr and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I.  INTRODUCTION

Appellants M.C. (Mother) and T.D. (Father) appeal the trial court's order terminating their parental rights to T.D. (Tess).[1]  In four issues, Mother complains that the evidence is legally and factually insufficient to support the termination of her parental rights under Family Code Subsections 161.001(b)(1)(D), (E), and (O) and that the evidence is legally and factually insufficient to support the trial court's best-interest finding.  In two issues, Father complains that the evidence is legally and factually insufficient to support the trial court's best-interest finding and that the trial court abused its discretion by admitting certain hearsay evidence over his objections. We will affirm.

### II.  BACKGROUND

#### A.  The Events Leading Up to Tess's Removal

Mother and Father are Tess's parents.  For the first three-and-a-half years of her life, Tess lived with Mother, Father, T.D. (Paternal Grandfather), and T.D. (Paternal Grandmother).[2]

---

[1]We use aliases to refer to the child, her family members, and others connected to this case.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

[2]Father testified that they lived in a duplex-style house, with Mother, Father, and Tess living on one side of the house and his parents living on the other side of the house.

## 1. The September 2020 Incident

Paige Martin, an investigator with the Department of Family and Protective Services (the Department), received a referral relating to Tess in September 2020 due to an allegation of domestic violence that had occurred the previous day between Mother and Father where Tess was present and Mother was intoxicated. Martin spoke to Mother on the phone regarding the incident the same day that she received the intake. Mother indicated to Martin that she had taken Tess for a walk, that she had returned home after the walk and "dr[u]nk a couple of shots of moonshine," that she had then lain down on a bed next to Father feeling "really, really drunk," and that she did not remember anything after that occurred. Mother relayed to Martin that she had been naked in the street at some point during the event and that she had sustained injuries, although Mother did not know how she received the injuries. Mother told Martin that she and Father had had "several different instances of domestic violence" in the past, describing how Father "had recently split her head open for smoking a cigarette[.]" Mother also indicated that she wanted to go to a shelter because "she didn't want [Tess] to grow up the way that she had grown up watching her mom get beat up by her boyfriends." When Martin told Mother that Father might need to participate in a Batterer's Intervention and Prevention Program (BIPP), Mother told Martin that Father was "gonna be so mad at [Mother]."

Three days after their phone call, Martin met Mother in person and observed that Mother's lip had been stitched up, and Mother "had somewhat of a black eye."[3] Martin inquired about Mother's substance abuse, and Mother indicated that she had smoked marijuana the previous week and that she had gotten "blacked-out drunk" three times in the prior year. Mother also admitted to "heavy drinking" while caring for Tess, but she denied methamphetamine use. Mother indicated that she "was done with [Father]" and that "she did not want to be with him anymore."

Martin later met with Father to discuss the September 2020 incident. According to Father, Mother had been drinking moonshine and had told him that she had drunk only two shots. Father recounted that Mother then took Tess for a walk "that would help with her buzz" and that after the walk, Mother took a shower. While Mother was in the shower, Father checked the moonshine to see how much Mother had drunk. Noticing that the moonshine only had "approximately two inches left in the quart jar," Father became disappointed in Mother because he believed she had lied about how much moonshine she had drunk. According to Father, he then poured the remaining moonshine into the shower while Mother was still in it. A few

---

[3]At trial, photos depicting Mother's injured lip and marks on her neck were admitted into evidence. Father admitted to causing the marks on Mother's neck but stated that he did not know when Mother's lip had been injured. Father acknowledged that Mother received medical care stemming from the September 2020 incident.

minutes later, Father heard "a loud thump" coming from the bathroom, and he went to check on Mother.[4]

According to Father, Mother then attempted to run out the front door while naked, and he grabbed her by the waist and pulled her back inside the house. Father recounted that the dispute spilled over to the bedroom, where Mother grabbed his lip, "so he smacked her on the top of the head." Father admitted that his hand was on Mother's neck at some point during the incident. Father also said that at some point during the dispute he was on top of Mother on a bed and that she grabbed his groin and got away. She then ran out the front door, slammed it so hard that glass broke, fell down the front steps, and then took off running.

Father acknowledged that Tess was present during some of the incident, including when he poured the moonshine into the shower and when he grabbed Mother around the waist and pulled her back inside the house. Father averred, however, that Tess was not present when he hit Mother on top of her head in the bedroom, noting that Paternal Grandfather came into the house during the dispute and took Tess outside to Paternal Grandfather's truck.[5]

---

[4]Father surmised that the noise he heard was caused by Mother slipping on the bathroom floor when getting out of the shower and hitting her head on a broken toilet that had been laying on its side on the bathroom floor, noting that the bathroom floor had gotten wet when he opened the shower curtain to dump out the moonshine.

[5]Father testified that Paternal Grandfather took Tess out of the house around the time that Father grabbed Mother by the waist while Mother was attempting to leave.

Father was later arrested and charged for assault to a family member or member of his household by impeding breath and circulation relating to the September 2020 incident.[6] *See* Tex. Penal Code Ann. § 22.01(b)(2)(B). Father bonded out of jail that same month, and he was required to wear an ankle monitor and to stay away from Mother.

Martin established safety plans for Mother and Father following the September 2020 incident that required, among other things, that they submit to drug testing. Around that time, Mother was tested for drugs, and her hair tested positive for methamphetamine. While Father told Martin that he was willing to submit to drug testing, he never submitted to the testing she requested.

### 2. The October 2020 Incident

Martin received a new intake in early November 2020 regarding a domestic-violence incident between Mother and Father that occurred in late October 2020.[7] Martin spoke to Mother on the phone regarding that event, and Mother told Martin

---

[6]The indictment relating to that charge—which was admitted into evidence at the termination trial—also referred to a November 2019 domestic-violence event between Father and Mother where Father was alleged to "intentionally or knowingly cause bodily injury to [Mother] . . . by striking her with [Father's] hand[.]" At trial, Father said he did not know what that November 2019 incident referred to. The indictment also contained a repeat offender notice, reflecting that Father had been convicted in 2012 for the "felony offense of illegal barter/expenditure invest in drugs[.]" At trial, Father acknowledged that he had been convicted of that offense.

[7]While Mother had been staying in a shelter after the September 2020 incident, she was kicked out of the shelter because she had missed curfew. Father testified that he and Mother got back together after he was bonded out of jail in September 2020.

that it occurred after she had gone to Father's attorney's office to drop charges against him. Father had bought Mother a bottle of vodka, which she drank, and then she and Father got into a physical altercation at a home in White Settlement.[8] Mother then ran from that home to a gas station and called the police. Father denied that the October 2020 incident occurred. Tess was removed from Mother's and Father's care in November 2020.

## B. The Events After Tess's Removal

### 1. Mother's Continued Drug and Alcohol Use Following Removal

Kierra Diaz, a permanency specialist employed by Our Community Our Kids (OCOK),[9] an agency contracted by the Department, testified regarding Mother's continued drug and alcohol problems following removal. Diaz stated that Mother had completed several services initially requested of her by the Department—including FOCUS Motherhood classes, domestic-violence education classes, and counseling—but that Diaz had asked Mother to reengage in counseling and drug treatment because of a July 2021 relapse where Mother's hair tested positive for

---

[8]Mother told Martin that Tess was with Mother's mother during the October 2020 incident. Martin testified that that information was inconsistent with the police report regarding the incident.

[9]OCOK is a private provider of community-based care that contracts with the Department to provide foster care case management, kinship, and family reunification services in parts of the state, including Tarrant County. *In re M.M.*, No. 02-21-00153-CV, 2021 WL 4898665, at *2 n.4 (Tex. App.—Fort Worth Oct. 21, 2021, pets. denied) (mem. op.).

7

methamphetamine.[10]  Mother also failed to take an October 2021 drug test requested by Diaz.  During an October 2021 phone call between Mother and Diaz, Mother admitted that she was still using marijuana and that she had been kicked out of a shelter where she was staying because of a failed drug test.  At that time, Mother told Diaz that she was pregnant.  Diaz discussed the importance of not using marijuana while pregnant, and Mother told Diaz that using marijuana helped with her nausea and helped her to not use methamphetamine.

Diaz met with Mother in late December 2021, and Mother told Diaz that she was still using methamphetamine and marijuana, having used both that month.  Mother informed Diaz that she desired to go to an inpatient drug treatment program, and in January 2022, Mother successfully completed a month-long inpatient drug treatment program.  The following month—February 2022—Mother gave birth to a son, Travis, who is Tess's half-brother.[11]  Diaz testified that Travis's meconium tested positive for methamphetamine and marijuana.

---

[10]Diaz testified that Mother initially denied methamphetamine use when confronted with the July 2021 test results but that Mother eventually admitted to using methamphetamine.  At trial, Diaz indicated that while Mother started a drug-treatment program after her relapse, Mother's attendance "taper[ed] off," and she did not complete the program.  Mother had reengaged in counseling by the time of trial.  Diaz also testified that Mother had not provided the Department proof that she had attended Alcoholics Anonymous and Narcotics Anonymous meetings.

[11]Travis is not Father's child.  We will refer to Travis's father as "Kevin Carter." We will refer to Travis's paternal grandparents as "Mr. Carter" and "Ms. Carter."

Samples of Mother's hair and nails were tested for drugs in February 2022. The sample from Mother's hair tested positive for marijuana, and the sample from Mother's nails tested positive for ecstasy, methamphetamine, and marijuana. Diaz testified that Mother refused to attend requested drug testing in March and April 2022.

After Travis's birth in February 2022, Mother and Travis moved into the home of Travis's paternal grandparents, the Carters.[12] Two months later—on Easter weekend 2022—Mother was kicked out of the Carters' home after becoming intoxicated.[13] Diaz spoke to Mother about that incident, and Mother stated that she "didn't remember the full events that had taken place," admitting that "she did drink to the point of intoxication and black[ed] out." Mother acknowledged that Travis was in her care at the time of that incident, and she admitted to becoming intoxicated on other occasions while caring for Travis, mentioning that it had also happened "approximately three or four weeks prior" to the Easter weekend.

As told by Mr. Carter, on the day of the occurrence, Mother "had gotten ahold of some alcohol and [became] very violent." Mother kept screaming, "I want to leave. I want to leave." Mother then ran out the door of the Carters' home wearing "just a

---

[12]The record reflects that Mother had been living in the Carters' home for several months prior to Travis's birth. Travis's father, Kevin, also lived at the Carters' home during this time.

[13]After being kicked out of the Carters' home, Mother moved in with her mother and stepfather, while Travis remained at the Carters' home.

shirt and a thong." Mr. Carter was able to get Mother back into the house to put more clothes on, and then Mother left—after slamming the door and "thr[owing] some stuff around . . . just trying to make a big mess."[14]

## 2. Father's Repeated Incarceration and Continued Drug Use

As mentioned above, Father had been arrested and charged with assault stemming from the September 2020 incident, and he had been released from custody on bond pending his trial. Father was sent back to jail in December 2020 because he had violated his bond conditions, and he remained in jail until April 2021.[15] Father was sent back to jail in July 2021 because he again violated his bond conditions, this time by testing positive for alcohol. In September 2021, Father pled guilty to his assault offense stemming from the September 2020 incident, and he was sentenced to two years' confinement. In February 2022, Father was released from his confinement and placed on parole for the remainder of his sentence.[16]

---

[14]Ms. Carter testified that this was not the first incident involving Mother and alcohol at the Carters' home.

[15]Father testified that he had violated his bond conditions by going to an exclusionary zone prohibited by his ankle monitor. Father explained that the exclusionary zone was an apartment where Mother was staying.

[16]As to services requested by the Department, Father testified that he was not offered any services while he was incarcerated. While on parole, Father had engaged in BIPP classes and had been attending drug-counseling sessions, although he had not completed those services. Earlier in the case, Father completed FOCUS for Fathers classes.

At trial, Father testified that he had been a daily user of methamphetamine up until the September 2020 incident. He said that he had used methamphetamine "[a] few times" after the September 2020 incident, and he stated that he did not know whether he was using methamphetamine during the October 2020 domestic-violence event but that it was "possible." Father testified that he was not using methamphetamine at the time of trial and that if he were required to take a drug test, it would be negative; Father clarified, however, that if he were required to take a drug test that used his hair as a sample, the results might be positive because he had "slipped up when [he] first got out of prison" when he "tried some meth." Diaz testified that she asked Father to submit to drug testing in March and April 2022, but Father did not comply. Diaz also stated that Father never completed a drug and alcohol assessment that she requested.

### 3. Tess's Placement with the Foster Family

Following removal, Tess was placed with a foster family consisting of a foster mother (Foster Mother), foster father (Foster Father), and two foster siblings (Foster Siblings) (collectively the Foster Family).[17] Foster Mother testified that Tess had a lot of tantrums when she first came into care, describing how Tess would kick, scream, and self-harm by pinching her arm or hitting herself in the face during those tantrums. Foster Mother said that Tess has been learning different strategies to help with her

---

[17]Tess was three when she was placed with the Foster Family. At the time of trial, she was almost five.

tantrums and that she had noticed an improvement in Tess. When Tess first came into care, she would kick and punch Foster Family's dog, but Tess was close to Foster Family's dog at the time of trial. Foster Mother testified that she and Foster Father had bonded with Tess and that Tess had bonded with them. She stated that Tess calls her "Mom" and calls Foster Father "Daddy."[18] She also said that Tess had bonded with Foster Siblings. Foster Mother and Foster Father were willing to adopt Tess.

Cori Uran, a counselor who provided play therapy to Tess, testified that the Foster Family was meeting Tess's needs, stating that they were able to offer her stability, consistency, and love. Uran also testified that Tess had told her that "[Father] beat up [Mother]," that "[Father] hurts [Mother]," and that Tess does not like living with Father and Mother "because they fight."

## C. Procedural Background

In its petition, the Department sought termination of Mother's and Father's respective parental rights based on, among other things, the predicate termination grounds set forth in Subsections (D), (E), and (O) of Section 161.001(b)(1) of the Family Code.[19] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O).

---

[18]Foster Mother acknowledged that Tess was also "very close" to Mother.

[19]The record reflects that Father, Mother, and an attorney ad litem also filed certain petitions in the suit seeking various forms of relief.

12

Following a three-day bench trial,[20] the trial court issued a ruling finding that Mother and Father had engaged in conduct under Subsections (D), (E), and (O) of Family Code Section 161.001(b)(1) and finding that termination of their respective parental rights was in Tess's best interest. Mother and Father appeal from that termination order.

### III. DISCUSSION

## A. Father's Evidentiary Complaint

In his second[21] issue, Father complains about two instances where the trial court admitted testimony over his hearsay objections.

### 1. The Two Instances Comprising Father's Evidentiary Complaint

In the first instance, Martin, the Department investigator, was asked what Tess had told her when she spoke to Tess after the September 2020 incident. Father's counsel objected on hearsay grounds, and the trial court overruled the objection. Martin then stated that Tess "ma[d]e an outcry," and Father's counsel immediately objected again on hearsay grounds. The trial court overruled the objection, stating, "Well, she said the child made an outcry. I'm going to overrule the objection." Martin then testified that "[Tess] said that she had heard or that her daddy had killed

_____

[20]The trial took place over three days on April 25, May 17, and May 19, 2022.

[21]We will address Father's first issue later in the opinion.

13

her mommy, and her mommy was in the hospital[.]" Father's counsel then renewed his hearsay objection, and the trial court again overruled the objection.

In the second instance, Martin was asked whether Mother had told her about any statements made by Tess regarding domestic violence. Father's counsel objected on hearsay grounds, and the Department responded that it was an admission by a party opponent. The trial court overruled the objection and permitted the testimony. Martin then testified that "[Mother] told [her] that [Tess] told [Mother] that [Father] was so mad at [Mother] that he beat [Mother]." Father's counsel then renewed his hearsay objection, and the trial court again overruled the objection. Martin then testified that "[Tess] told [Mother] that [Mother] was in the shower, and [Father] was so mad that he beat [Mother]."

## 2. Standard of Review

To obtain reversal of a judgment based on an error in the trial court, the appellant must show that the error occurred and that it probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court. Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005). We will not reverse a trial court's judgment because of an erroneous evidentiary ruling unless the ruling probably, though not necessarily, caused the rendition of an improper judgment. *Gunn v. McCoy*, 554 S.W.3d 645, 668 (Tex. 2018); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 136 (Tex. 2012). The complaining party must usually show that the whole case turned on the evidence at

14

issue. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001) (op. on reh'g); *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995). Error in admitting evidence is generally harmless if the objecting party fails to again object when the same or similar evidence is later introduced. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 235 (Tex. 2007); *Richardson v. Green*, 677 S.W.2d 497, 501 (Tex. 1984). Error admitting evidence is also generally harmless if the contested evidence is merely cumulative of properly admitted evidence and does not control a material and dispositive issue. *Interstate Northborough P'ship*, 66 S.W.3d at 220.

### 3. Analysis

As to the first instance of Father's complaint—Martin's testimony that Tess said that Father had killed Mother and that Mother was in the hospital—the testimony relating to Father having killed Mother was not offered for the truth of the matter asserted. Therefore, it was not hearsay. *See* Tex. R. Evid. 801(d); *Ash v. Hack Branch Distrib. Co.*, 54 S.W.3d 401, 412 (Tex. App.—Waco 2001, pets. denied) ("Because the remainder of Smith's objected-to testimony does not appear to have been offered to prove the truth of the matters asserted therein, we conclude that it is not hearsay."). Even if we assumed that that the trial court erred by overruling Father's hearsay objection to the first instance of Father's complaint, Father has not demonstrated harm. Diaz, the OCOK permanency specialist, testified that "[Tess] was worried at one point that [Father] had killed [Mother]." Father did not object to that testimony. Father also acknowledged at trial that Mother had received medical

15

treatment stemming from the September 2020 incident. Because Father failed to object when similar evidence was introduced at trial, any error in admitting evidence as to the first instance of Father's complaint was harmless. *See Bay Area Healthcare Grp.*, 239 S.W.3d at 235; *Richardson*, 677 S.W.2d at 501.

As to the second instance of Father's complaint—Martin's testimony that Tess told Mother that Father was so mad at Mother that he beat Mother—even assuming that the trial court erred by overruling Father's hearsay objection, Father has once again not demonstrated harm. Father asserts that this testimony was harmful because it "permitted the trial court to consider the statements of [Tess] in resolving the breadth and severity of the alleged domestic violence between [Father] and [Mother]." But more damning evidence of the breadth and severity of Father's domestic violence against Mother was admitted at trial. Martin testified that Mother had mentioned "several different instances of domestic violence" between Father and Mother in the past and that Mother described how Father had once "split her head open for smoking a cigarette[.]" Martin also observed that Mother had an injured lip and a black eye following the September 2020 incident, and the record contains photos depicting Mother's injuries following that occurrence. Perhaps most importantly, Father pled guilty to assault stemming from the September 2020 incident. Moreover, Uran, the counselor who provided play therapy to Tess, testified that Tess told her that "[Father] beat up [Mother]," that "[Father] hurts [Mother]," and that Tess does not like living with Father and Mother "because they fight." Because other evidence

16

was properly admitted demonstrating the breadth and severity of Father's domestic violence against Mother, any error in admitting the second instance that Father complains of was harmless. *See Interstate Northborough P'ship*, 66 S.W.3d at 220; *see also Mayes v. State*, 816 S.W.2d 79, 88 (Tex. 1991) ("[W]e conclude that the admission of Johnson's testimony without objection rendered the admission of Bitenc's testimony harmless because it established substantially the same evidence of appellant's character as did the admission of Bitenc's testimony.").

We overrule Father's second issue.

## B. Conduct Grounds

In her first three issues, Mother argues that the evidence is legally and factually insufficient to support termination under Family Code Subsections 161.001(b)(1)(D), (E), and (O).[22]

### 1. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex.

---

[22]In contrast to Mother, Father does not challenge the trial court's conduct-ground findings.

17

2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged findings to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.* The factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

We must perform "an exacting review of the entire record" in determining the factual sufficiency of the evidence supporting the termination of a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant them with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). Here, we review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the

18

Department proved the conduct grounds. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

### 2. Applicable Law

Subsections (D) and (E) provide that the trial court may order the termination of a parent's rights if it finds by clear and convincing evidence that the parent has

    (D) knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child; [or]

    (E) engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

"Endanger" means to expose to loss or injury, to jeopardize. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Under Subsection (D), it is necessary to examine the evidence related to the environment of the child to determine if the environment was the source of the endangerment to the child's physical or emotional well-being. *J.T.G.*, 121 S.W.3d at 125. The conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child. *Id.* For example, "abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional

19

well-being of a child." *Id.* Illegal drug use by the parent and drug-related criminal activity by the parent "likewise support[] the conclusion that the child[]'s surroundings endanger [her] physical or emotional well-being." *Id.*

Under Subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act. *See id.*; *see also* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. *Boyd*, 727 S.W.2d at 533; *J.T.G.*, 121 S.W.3d at 125. The specific danger to a child's well-being may be inferred from parental misconduct standing alone. *In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child." *Id.* Illegal drug use and its effect on the parent's life and alcohol abuse may establish an endangering course of conduct. *Id.*; *In re A.M.M.*, No. 04-20-00511-CV, 2021 WL 1394308, at *3 (Tex. App.—San Antonio Apr. 14, 2021, no pet.) (mem. op.). We may consider conduct that occurred outside the child's presence in our review. *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

20

### 3. Analysis

Because the evidence pertaining to Subsections (D) and (E) is interrelated, we conduct a consolidated review of those Subsections. *See In re S.H.*, No. 02-17-00188-CV, 2017 WL 4542859, at *10 (Tex. App.—Fort Worth Oct. 12, 2017, no pet.) (mem. op.); *In re T.N.S.*, 230 S.W.3d 434, 439 (Tex. App.—San Antonio 2007, no pet.).

Here, the record reflects that illegal drugs and alcohol abuse have been persistent problems in Mother's life. The September 2020 incident occurred at a time when Mother was intoxicated to the point where she could not remember it. Tess was also in the home at the time. When Martin investigated this event, Mother admitted to "heavy drinking" while caring for Tess and to marijuana use. Mother tested positive for methamphetamine around the time of that occurrence. Alcohol also contributed to the October 2020 incident, with Mother describing it as occurring after she drank vodka and got into a physical altercation with Father.

Mother's problems with drugs and alcohol continued after Tess's November 2020 removal. As to Mother's drug use following removal, Mother tested positive for methamphetamine in July 2021. Mother admitted to using methamphetamine and marijuana in December 2021, at a time when she was pregnant with Travis. Mother's hair tested positive for marijuana in February 2022, and that same month, Mother's nails tested positive for ecstasy, methamphetamine, and marijuana. While Mother completed an inpatient drug treatment program in January 2022, she did not submit to requested drug testing in March and April 2022. *See*

21

*J.T.G.*, 121 S.W.3d at 131 (holding that factfinder "could have reasonably inferred that [father's] failure to complete the scheduled drug screens indicated he was avoiding testing because he was using drugs"). As to Mother's alcohol abuse following removal, Mother was kicked out of the Carters' home during Easter weekend 2022 after she became intoxicated. Once again, Mother could not recall what had occurred during that incident, admitting that "she did drink to the point of intoxication and black[ed] out." Travis was in Mother's care at that time, and Mother admitted to being intoxicated on other occasions while caring for Travis.

Viewing all the evidence in the light most favorable to the trial court's judgment and recognizing that the factfinder is the sole arbiter of the witnesses' credibility and demeanor, we hold that there is some evidence of an endangering environment on which a reasonable factfinder could have formed a firm belief or conviction that Mother had knowingly placed or had knowingly allowed Tess to remain in conditions or surroundings that endangered her emotional or physical well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D). Likewise, we hold that there is some evidence of endangering conduct on which a reasonable factfinder could have formed a firm belief or conviction that Mother had engaged in conduct that endangered Tess's physical or emotional well-being. *See id.* § 161.001(b)(1)(E).

Giving due deference to the factfinder's endangering-environment and endangering-conduct findings, without supplanting the factfinder's judgment with our own, and after reviewing the entire record, we hold that a factfinder could reasonably

22

form a firm conviction or belief that Mother had knowingly placed or had knowingly allowed Tess to remain in conditions or surroundings that endangered her emotional or physical well-being and that Mother had engaged in conduct that endangered her physical or emotional well-being. *See id.* § 161.001(b)(1)(D), (E). We thus overrule Mother's first and second issues.[23]

Because we hold that the evidence is legally and factually sufficient to support the endangerment findings under Section 161.001(b)(1)(D) and (E), and because only one finding is necessary to sustain a parental-rights termination, we need not address Mother's challenge to the trial court's finding under Section 161.001(b)(1)(O). *See* Tex. Fam. Code Ann. § 161.001(b)(1); *E.N.C.*, 384 S.W.3d at 803; *J.L.*, 163 S.W.3d at 84; *see also* Tex. R. App. P. 47.1. We therefore do not address Mother's third issue.

## C. Best Interest

In her fourth issue and in his first issue, Mother and Father each argue that the evidence is legally and factually insufficient to support the trial court's respective best-interest findings.

---

[23]In her brief, Mother portrays herself as a "victim" and states that "[o]nce [she] was able to break free of the cycle of Father's abuse, she demonstrated the capability to be protective of [Tess]." While we acknowledge that Mother was a victim of domestic violence, we disagree with her characterization that she has demonstrated the capability to be protective of Tess. As detailed above, Mother's problems with illegal drugs and alcohol abuse continued long after she broke free of Father's abuse.

## 1. Standard of Review and Applicable Law

We review the parties' respective challenges to the sufficiency of the trial court's best-interest findings under the same review standards stated above regarding the conduct grounds. Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Evidence that is probative of the predicate grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2). *In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013); *C.H.*, 89 S.W.3d at 28. We also consider the evidence in light of the following nonexclusive factors that the factfinder may apply in determining the child's best interest:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent–child relationship is not a proper one; and

• the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding. *Id.*; *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *7 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.); *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

## 2. Analysis as to Mother

As to Tess's emotional and physical needs now and in the future and the emotional and physical danger to her now and in the future, the record reflects that Mother had a history of illegal drug use and alcohol abuse. As detailed above, Tess was removed from Mother's care after two domestic-violence incidents in 2020, both of which occurred while Mother was intoxicated and at least one of which occurred while Tess was present. Mother admitted to "heavy drinking" while caring for Tess, and the record reflects that Mother had been using marijuana and methamphetamine prior to Tess's removal.

Tess's removal did not serve as a wake-up call to Mother. Mother tested positive for methamphetamine in July 2021; she admitted to using methamphetamine and marijuana in December 2021; she tested positive for ecstasy, methamphetamine, and marijuana in February 2022; and she refused drug testing in March and April 2022. Mother also acknowledged that she had been intoxicated while caring for Travis on several occasions, describing being intoxicated to the point that she "black[ed] out." The trial court was entitled to find that these factors weighed in favor of terminating Mother's parental rights to Tess.

As to the plans for Tess, Mother did not articulate any plan for Tess at trial.[24] In contrast, the Department put on testimony that Foster Mother and Foster Father desired to adopt Tess. The record reflects that Tess had bonded with the Foster Family and that the Foster Family was meeting Tess's needs and providing her stability, consistency, and love. The trial court was entitled to find that this factor weighed in favor of terminating Mother's parental rights to Tess.

Viewing the evidence in the light most favorable to the trial court's best-interest finding, we hold that a reasonable factfinder could have formed a firm conviction or belief that termination of the parent–child relationship between Mother and Tess was in Tess's best interest, and we therefore hold that the evidence is legally sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. §

---

[24]Mother did not testify at trial.

161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Based on our exacting review of the entire record and giving due deference to the factfinder's findings, we likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Mother's fourth issue.

### 3. Analysis as to Father

As to Tess's emotional and physical needs now and in the future and the emotional and physical danger to her now and in the future, the record reflects that Father was violent toward Mother in the family home in September 2020 and that Tess was present during part of that violent encounter. That violent encounter was not an isolated incident. Mother referenced "several different instances of domestic violence" with Father in the past to a Department investigator, describing one occasion where he "split her head open[.]" Father ultimately pled guilty to assault stemming from the September 2020 incident and was sent to prison.

Father also demonstrated a propensity for criminal activity. Apart from his conviction for assault stemming from the September 2020 incident, Father acknowledged that he had also been convicted of a felony offense in 2012 relating to drugs. Moreover, Father admitted that he had been jailed on two occasions stemming from violations of his bond conditions while he was awaiting trial for his assault case, one of which was caused by entering the exclusionary zone prohibited by his ankle monitor and the other caused by his drinking alcohol.

27

Father also had persistent problems with illegal drugs. The record reflects that Father refused to submit to drug testing requested by the Department around the time of Tess's removal, and he also refused to submit to drug testing in the two months before trial. Father testified that he had used methamphetamine daily up until the September 2020 incident. He admitted to using methamphetamine "[a] few times" after the September 2020 incident, acknowledging that he had used methamphetamine after his February 2022 release from prison. Father candidly acknowledged that he might fail a drug test if he were required to take one at trial due to his relapse after his release from prison. The trial court was entitled to find that these factors weighed in favor of terminating Father's parental rights to Tess.

As to the plans for Tess, Father stated at trial that he believed that his parents, his grandparents, and the Carters were all acceptable placements for Tess. As to Paternal Grandfather and Paternal Grandmother, the record reflects that Paternal Grandfather had been in prison in the past for assault and that there were concerns that he had downplayed the September 2020 domestic-violence incident between Mother and Father. The record also demonstrates that Tess did not feel safe around Paternal Grandmother, that Tess told a counselor that Paternal Grandmother "beats [her] ass," and that Paternal Grandmother had a history of marijuana use.[25] It also shows that Paternal Grandfather "had a history of violence against [the] police" and

[25]At trial, Paternal Grandmother denied spanking Tess and testified that she had not used marijuana for "[a]lmost a year."

that Paternal Grandfather and Paternal Grandmother "were very noncompliant with authority and [the] police." As to Father's grandparents, the record reflects that they had allowed Father unapproved access to Tess and had told Tess to keep it a secret. Diaz also testified that she had concerns for their physical ability to care for Tess due to their advanced age. As to the Carters, the record reflects that they remodeled their home to add a bedroom for Tess, that Travis was currently living in their home, and that they desired for Tess to live with them. The record also reflects, however, that the Carters were aware that Mother was alone with Travis while Mother was intoxicated. Moreover, Diaz expressed a concern that there was a lack of a bond between the Carters and Tess, stating that they did not have a biological relationship or an ongoing relationship.

In contrast to some of the concerns regarding Father's suggested placement for Tess, the record reflects that Tess had been living with the Foster Family since removal, that she had bonded with them, and that the Foster Mother and Foster Father desired to adopt her. There was also evidence that the Foster Family was meeting Tess's needs and providing her stability, consistency, and love. The trial court was entitled to find that this factor weighed in favor of terminating Father's parental rights to Tess.

Viewing the evidence in the light most favorable to the trial court's best-interest finding, we hold that a reasonable factfinder could have formed a firm conviction or belief that termination of the parent–child relationship between Father

and Tess was in Tess's best interest, and we therefore hold that the evidence is legally sufficient to support the trial court's best-interest finding. *See* Tex. Fam. Code Ann. § 161.001(b)(2); *J.P.B.*, 180 S.W.3d at 573. Based on our exacting review of the entire record and giving due deference to the factfinder's findings, we likewise conclude that the evidence is factually sufficient to support the trial court's best-interest finding. *See C.H.*, 89 S.W.3d at 18–19. Accordingly, we overrule Father's first issue.

## IV. CONCLUSION

Having overruled Mother's dispositive issues and Father's two issues, we affirm the trial court's termination order.

/s/ Dana Womack

Dana Womack
Justice

Delivered: October 20, 2022